(15 App. Div. 109.)

TRADESMEN'S NAT. BANK OF CITY OF NEW YORK v. YOUNG et al.

(Supreme Court, Appellate Division, Second Department. March 19, 1897.)

FRAUDULENT CONVEYANCES—ACTION TO SET ASIDE—PREFERENCES.

An assignment for benefit of creditors will not be set aside at the instance of a judgment creditor of the assignor on the ground that the assignment was part of a scheme to defraud creditors, where judgment had been obtained by another creditor setting aside, as against the assignee, certain conveyances made by the assignor, and appointing a receiver of all the assignor's property.

Appeal from special term, Westchester county.

Action by the Tradesmen's National Bank of the City of New York against John W. Young and others. The complaint was dismissed, and plaintiff appeals. Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and BRADLEY, JJ.

A. Blumenstiel, for appellant.

John J. McKelvey, for respondents.

GOODRICH, P. J. This is a creditors' action upon judgments recovered in April, 1895, against the defendants, John W. Young, Albert J. Young, and Irving W. Young, formerly composing the firm of John W. Young & Sons, against Charles T. Sutton, assignee of the firm and of the individual partners, and against the John W. Young & Sons Company, whereby the plaintiff seeks to secure for its own judgments payment in preference to all other creditors. It is not brought for the benefit of creditors who may unite with the plaintiff in the prosecution of the action. Later, Austin B. Fletcher, who had been appointed receiver of the property of the firm, was made a party defendant. The firm of John W. Young & Sons had transacted business as dealers in lumber, coal, etc., at White Plains for many years, having occupied in their business certain real estate belonging individually to John, the senior partner, upon which the firm had erected a mill, elevator, and other buildings used in their business. The defendants Albert J. Young and Irving W. Young, with three other persons, had, some time previously to the assignment, formed a corporation, the Tuckahoe Lumber & Coal Company, which was doing a coal business at Tuckahoe. The parties, in July, 1894, had formed another corporation, the John W. Young & Sons Company, to which corporation John conveyed the real estate theretofore as well as thereafter occupied by the firm; and there is evidence tending to show that it was the intention of the parties that this company should succeed to the business of the firm on account of the illness and expected death of the father, John. The three Youngs, their sister, Laura, and one Cromwell, were the directors; John was president, Albert vice president, and Irving secretary. All of the stock of this corporation was issued to John in payment for the transfer of the real estate, and all of it, except five shares held by Laura and five by Cromwell, was owned by the three Youngs. The Young Company had no other property, and seems to have transacted no business down to February 19, 1895. The firm, on February 19th, transferred to the Young

.298    44 NEW YORK SUPPLEMENT    (Sup. Ct.

and 78 New York State Reporter.

Company all of its property, except outstanding accounts and the bonds and stock of the company. There is evidence tending to show that this was one of the purposes with which the corporation was originally formed; that it was all along intended to carry out this plan; and that John supposed that it had been consummated as agreed upon at the start. The value of the personal property thus transferred amounted to about $80,000, and the consideration therefor was bonds of the company of the face value of $112,000, payable in 20 years. The Tuckahoe Company also conveyed to the Young Company some real estate at White Plains, occupied by it, in consideration of certain bonds of that company, which thus became the owner of all the real estate which had been occupied by the Tuckahoe Lumber Company and by the firm, and of all the property of the firm except its outstanding accounts and the bonds and stock of such company. The Tuckahoe Company, which was indebted to one Henry J. Braken in the sum of $50,000, also made a general assignment on February 19th to the defendant Sutton. John had conveyed to his wife, Hester, by deed dated July 30, 1894, and recorded on February 4, 1895, for a nominal consideration, certain other real estate, the real consideration being the release by Hester of her inchoate dower in the conveyance to the Young Company. Albert also had conveyed to his wife, Mary, by deed acknowledged and recorded November 24, 1894, certain other real estate, in consideration of an indebtedness due by Albert to his wife, and in excess of the value of the property. Irving, by deed acknowledged and recorded September 29, 1894, had conveyed to his wife, Hettie, certain other real estate, in consideration of an indebtedness due by him to his wife, in excess of the value of the property. On February 20th, the firm and the individual members thereof executed a voluntary general assignment of all their property to the defendant Sutton, for the benefit of creditors, without preferences, and delivered to the assignee thereunder the book accounts of the firm, a small parcel of real estate, and the stock and bonds of the Young Company. At the trial there was evidence tending to show that the assignment and other transactions were not made with any fraudulent intention on the part of the firm, and that it was expected to sell the bonds, and raise money on the bonds and property with which to pay off the creditors of the firm. This was elicited by the plaintiff's counsel in his examination of the defendant Irving Young, whom he called as a witness. Other witnesses testified that one of the reasons why the real estate was conveyed to the Young Company was that John was an invalid, bedridden, and unable to attend to business, and that his death was anticipated; and it does not appear that either he or the firm was insolvent at the time of such conveyance of the real estate.

It is to be observed in this connection that the original agreement, made when John conveyed his real estate to the Young Company, was that the firm should also transfer all its personal property and business, and that this transfer was delayed for some unexplained reason, but without the knowledge of John, so that the bonds and stock which had been delivered to him in payment for his land were not as valuable as they would have been if the firm's personal prop-

erty and business had been transferred to the company at the same time as the real estate, whereby the bonds and stocks would have had additional basis of value, and that John was not aware of the failure. When this fact came to the knowledge of Judge Robertson, his counsel, on February 19th, he advised that it was only just to John that the transfer should be made at once, and it was then made in pursuance of the original plan and agreement, which were arranged at the time of the formation of the Young Company. Up to that time there had been no conclusion arrived at as to any assignment by the firm. The reason for making the assignment was testified to be the fact that the firm was indorser on the notes of the Tuckahoe Company, and that, as that company was a foreign corporation, it was feared that an attachment would be obtained against its property; but no suggestion was made as to such necessity for an assignment by the firm until the evening of the 19th of February, after the transfer to the Young Company had been completed. The assignment of the firm was drawn that evening, although it was not executed till the 20th, and, even when it was drawn, there seems to have been a reasonable doubt in the minds of the parties whether or not it would be executed. Irving, who especially proposed and urged the assignment, was in a nervous and excited condition, but stated that the firm had assets in excess of its liabilities. This, undoubtedly, was not true, but it is evidence tending to show that there was not an intention to execute the assignment till after the transfer had been made to the Young Company. Although there had been discussion as to the making of an assignment on the 18th, there is positive testimony that this intention had been abandoned, or at least suspended, till the evening of the 19th, when it was renewed, through fear of the issuing of attachments against the Tuckahoe Company.

In April, 1895, Badger & Winslow, creditors of the firm of John W. Young & Sons, commenced an action against Sutton, as assignee, and against the members of the firm and their wives, and against the Young Company, to which defendants the Tuckahoe Company and Sutton, assignee of that company, were subsequently added as parties, praying that the deeds which had been given by John to the Young Company, and by the three Youngs to their wives, and the transfer of the firm assets to the Young Company, should be declared fraudulent and void as against the assignee, and that the Young Company and the three wives of the defendants be compelled to turn over all the real and personal property thus received, or the proceeds thereof, to the assignee, and that pending the action a receiver might be appointed. Such receiver was appointed July 15, 1895. By stipulation between the parties to this action, approved and signed by a large number of the creditors of the firm and corporation, the action as to the wives was dismissed, and a judgment was entered in February, 1896, setting aside, as against the plaintiffs, the other creditors of the firm and the assignee, the conveyance by John to the Young Company, and the transfer of the personal property by the firm to that company. Austin B. Fletcher, who had been appointed temporary receiver, was by this judgment made permanent receiver of, and became vested

with the title to, the entire estate, real and personal, owned or used by the Tuckahoe Company, the firm, and the individual members thereof, except as to the above-named conveyances to the wives of the partners, in respect of which no reference is made and no judgment demanded in the present action; and he was ordered to make final distribution of the property among the creditors.

Upon this state of facts, it is evident that two questions arise: First. Was the assignment of the firm to Sutton intended to, or did it, hinder, delay, or defraud creditors? And, second, should all the transactions of February 19th and 20th be considered in deciding the question as to the fraudulent character of the assignment?

In considering these questions, care must be taken to ascertain whether the proceedings anticipatory of the assignment were fraudulent and hostile to the assignment, or whether the assignment is a vehicle of a contemplated fraud.

Section 1, c. 314, Laws 1858, provides as follows:

"That any executor, administrator, receiver, assignee or other trustee of an estate, or the property and effects of an insolvent estate, corporation, association, partnership or individual, may, for the benefit of creditors or others interested in the estate or property so held in trust, disaffirm, treat as void and resist all acts done, transfers and agreements made, in fraud of the rights of any creditor, including themselves and others, interested in any estate or property held by or of right belonging to any such trustee or estate."

Prior to the passage of this act, the assignee had no more right to recover back property which his fraudulent assignor had conveyed than such assignor would have had; but this act authorized a new class of actions, such being the decision of the court of appeals in several cases.

In Spelman v. Freedman, 130 N. Y. 421, at 427, 29 N. E. 767, the court said:

"The act of 1858 authorized a new class of actions, analogous in many respects to creditors' bills, to be brought for the benefit of all the creditors alike, by the assignee or other representative of an insolvent estate, to set aside fraudulent transfers by the debtor. Such actions require no lien, but are maintained by force of the statute."

In Southard v. Benner, 72 N. Y. 424, the court said, at page 427:

"This act gave a new remedy in favor of creditors at large, by giving to an assignee or trustee for their benefit a statutory right to property conveyed in fraud of creditors; and this statutory right took the place of the specific lien of individual creditors required by law as a condition of their right to contest the validity of the transfers."

The complaint in the Badger Case alleges a demand upon the assignee to bring the action, and his refusal to do so, whereupon the right to bring the action devolved upon the plaintiff. And such was the decision of the court in Dewey v. Moyer, 72 N. Y. 73, where it was said:

"If the assignee should refuse or neglect to sue for and reclaim property fraudulently transferred, it is abundantly established that the creditors may commence an action to reach the property, making the assignee, the debtor, and his transferees parties defendant,"—citing cases.

This was cited with approval in Spelman v. Freedman, supra.

It seems to me that, upon the evidence, the learned court at special term was justified in holding that the transactions of February

19th were not a part of a scheme by which the firm was guilty of a legal fraud in attempting to hinder, delay, and defraud creditors; that the evidence shows that there was no fraud; and that the most that can be said is that, acting, as they did, under competent legal advice, they were only guilty of what the law calls a "constructive fraud"; and that the acts are dissociated with the execution of the assignment. The common law permits unlimited preferences among creditors where no voluntary assignment is made, and the statute governing assignments for the benefit of creditors permits a limited preference under such assignments; but the general policy of the law is in favor of an equal distribution of an insolvent's property among all his creditors. The result of all the proceedings in this matter has been to place the entire property of the firm in the hands of a receiver for equal distribution, and a court should not be swift to seek or to enforce remedies to disturb such an arrangement in order to work out a preference for a judgment creditor, notwithstanding the ancient maxim as to the reward due to the vigilant.

Approval of this new view will be found in the case of Maass v. Falk, 146 N. Y. 34, at pages 40, 41, 40 N. E. 505, where the court said in a somewhat analogous case:

"In such a case they should come into court, and ask its equitable aid to secure to themselves and the other creditors, who were excluded by these instruments from a share in the debtors' assets, that ratable distribution of two-thirds thereof which the act of 1887 intended they should in all events have. Otherwise, they would, by reason of their judgments, obtain a preference in the payment of their debts, which they complain of as having been given by the debtors to other of their creditors. That is a position which a court of equity could not regard with any favor. * * * In such a case the maxim, 'Vigilantibus et non domientibus jura subveniunt,' cannot be invoked. It has application in cases where it is the policy of the law to reward enterprise, and to punish indolence and negligence. It is needless to observe that it cannot be the policy of the law to encourage an activity which would defeat one of its principal objects."

I conclude, therefore, that the rights of the creditors will be better protected and more equally secured by refusing the plaintiff the relief which it seeks in this action.

The judgment should be affirmed. All concur.